# I.

## Case No. 6,991.

### I—— v. The I. M. LEWIS and The ALINE.

[6 Chi. Leg. News, 304.]

District Court, N. D. Florida. 1874.

LIBEL FOR COLLISION—LIABILITY AND DUTY OF STEAM-TOW.

While the schooner Coffin was lying at her wharf, the bark Aline being towed by the steam tug Lewis, collided with the Coffin. It was contended by the claimant of the tug: 1st. That the tug was the servant of the bark, and entirely under the direction of the master of the bark. 2d. That the tug was, in all respects properly managed, committed no error in her rate of speed, nor in the manner, direction or nearness of her approach to the wharf and to the Coffin. 3d. That the bark was in fault in directing the tug to steer into the stream, and also in not putting her helm to the starboard, to prevent the collision. *Held*, under the evidence, that the Aline was guilty of no fault, and that the tug alone is liable to make good the damage; that a steam tow-boat, unless wholly under the command of the tow and implicitly obeying its orders, is bound to use all necessary care, foresight and skill to provide for the safety of the tow, or she will be held responsible.

[This was a libel by William G. I——, master of the schooner I. W. Coffin, against the steam-tug I. M. Lewis, and the bark Aline, for damages resulting from collision.]

FRASER, District Judge. The libel in this case is filed against the steam tug I. M. Lewis and the bark Aline, in a cause of collision, civil and maritime.

It is charged in the libel, admitted by the answers of the claimants of the tug and bark, and fully established by the evidence, that on the first day of December, 1869, the said schooner I. W. Coffin was lying securely moored at the wharf of Alsop & Clark's mill, in the city of Jacksonville, on the north bank the St. Johns river, in the district aforesaid, taking in a cargo of yellow pine lumber, her bow lashed to the wharf and her stern anchored in the stream when the collision took place, and that the said Coffin is not chargeable with any fault. The contest lies between the tug and the bark, as to which shall be made liable for the damage caused by the collision, each charging the other with the fault. It appears from the evidence that the consignees of the bark had employed the tug to tow the bark to the same wharf at which the Coffin was lying. That on the day mentioned the tug took the bark in tow astern with a hawser from forty feet to forty fathoms in length—the witnesses differing widely on this point. That the tug, with the bark in tow, steamed down the river to a point on the south bank, about a quarter of a mile lower down the river than Alsop & Clark's wharf, and then steered diagonally across in a northwesterly course toward said wharf, at a rate of speed at from three to seven miles an hour; though the witnesses in the main agree that her speed was about four miles an hour. As the tug came opposite to the Coffin, or a little above her, she sheered out into the stream, letting the swag of the hawser fall into the water, according to one witness, or all in a bight under the bottom of the bark, according to another, and leaving the bark to run at hap hazard, as stated by a third. Being thus left to her own control, the stern of the bark came in contact with the end of the Coffin's boom, which projected from five to seven feet over her stern, parted her hawser, and did other damage to the said vessel.

It is contended on the part of the claimant of the tug—1st. That the tug was the servant of the bark, and entirely under the direction of the master of the bark. 2d. That the tug was in all respects properly managed; committed no error in her rate of speed, nor in the manner, direction or nearness of her approach to the wharf and to the Coffin. 3d. That the bark was in fault in directing the tug to sheer into the stream, and also in not putting her helm to the starboard to prevent the collision.

As to the first point, the master of the Aline testifies that he was in command of his own vessel, but the tug took him wherever it pleased. John Mullins, master of the tug, testifies: "I did not take my orders from the captain of the bark Aline, except when

he told me to round her, and when he told me to let go the hawser." "No orders were given from the bark Aline except to round to and to cast off. No others were given." It would seem, then, that the masters of the tug and tow each managed his own vessel; that the tug was under the control of her master, and as the evidence shows, no order was given from the bark before the collision, but "let go the rope," which was misunderstood and not obeyed by the tug. The tug, therefore, if in fault in any particular, will be responsible for the damage.

At the time of the collision the tide was ebb, and the wind was from the southwest. The tide and wind were down the river, and the tug, with the tow, were heading across diagonally to the northwest, so that when the bark approached the wharf the wind and tide struck her, quartering on her bow, which set her in towards the Coffin. The wind and tide ought then to have been considered, and the bark ought not to have been towed so near that she had not abundant room to turn, nor at so rapid a rate of speed that she could not have dropped her anchor to bring her up. The tug was clearly in fault in these particulars, as the evidence shows. Besides, when she sheered out into the stream, heading to the southwest, she might have kept her hawser taut, and thus have turned the bark more rapidly and helped to avoid the collision. This she should have done, keeping the bark under her control and giving the required aid when the danger was imminent. But instead of doing this, she stopped, slackened her hawser, letting it fall, all in a bight, under the bark, letting the bark go at haphazard, at the mercy of the wind and tide, running at a too rapid speed, with such help only as her rudder afforded after the propelling power of the tug ceased. These facts show want of foresight, mismanagement and incompetency in the master of the tug. The first fault, then, was in the tug in steaming too fast; in not providing against the effect of wind and tides, and in bringing her tow so near before casting off that she could not provide for her own safety; and in not giving her the aid of his propelling power when her danger was apparent. Mr. Justice Wayne, in the opinion of court in the case of The New Philadelphia, 1 Black [66 U. S.] 76, says: "the rule of law is that when a third party has sustained an injury to his property from the co-operating consequences of two causes, though the persons producing them may not be in intentional concert to occasion the result, the injured person is entitled to compensation for his loss from either one or both of them, according to the circumstances of the incident, particularly so from the one of the two who had undertaken to convey the property with care and skill to a place of destination, and there shall have been, in so doing, a deficiency in either."

We must next inquire whether the bark is also in fault, and liable to participate with the tug in making good the damage caused by the collision. The master and mate of the Aline, both testify that when the bark got opposite the place where she should have gone, they told the captain of the tug to let go the rope. The master of the bark gave the order in English; the mate also, from the bow of the bark gave the same order, and the master waived his hat, and told the master of the tug to let go the rope, told him four or five times to do so. The master of the tug says that he stopped below the creek, and asked the master of the Aline where he wanted to drop his anchor—"this was about an eighth of a mile below Alsop & Clark's mill. I was going at the time about west, right up the river. I was about six or seven hundred yards from the shore at the time. The captain in answer to my question, made motion with his hand and told me to round her. I rounded according to his order; by rounding, I mean I brought the head round to the south'ard. At the time I stopped and spoke the captain of the bark, she came up within thirty feet of me; I obeyed the orders of the captain of the bark when he ordered me to round to. The distance between the Coffin and the I. M. Lewis, when I passed, was about two hundred and fifty feet. At the time I was heading to the southward, the bark was heading towards the northward—about northwest,—I commenced to round to before I got to the Coffin. The hawser at this time was all in a bight, under the bottom of the Aline; was not taut; the bark was going about three or four miles an hour through the water." The master of the tug must have been mistaken as to his course; for had he been six or seven hundred yards from the shore, and an eighth of a mile below Alsop & Clark's mill, according to a map of that part of the river made by a competent engineer, had he been running west when he arrived opposite the Coffin, he would have been as far out at least as he was an eighth of a mile below. It is also difficult to reconcile the statement that the steamer was running west and the bark northwest while in tow; such a statement seems absurd. The master of the tug must have misapprehended the order given by the master and repeated by the mate of the Aline, to let go the rope, which, had he obeyed, an eighth of a mile below Alsop & Clark's, the Aline, with the wind and tide against her, would have checked her headway enough to have made it safe to cast anchor. The master of the tug also says, the bark had got by the schooner before she let go her anchor. A little flood-tide was running. If it was flood-tide, and the bark had passed the schooner on her second turn, how was it possible for her to settle back into the schooner against the tide? The statements of this witness are made too carelessly and too much at random, to give them such verity as to overcome the evidence of witnesses entirely dis-

interested and standing neutral between the tug and the bark, as well as that of officers of the Coffin and the libelant, whose interest it is to hold the bark as well as the tug responsible. This witness also says, that the bark had her wheel a-port, though he could not see how her wheel was worked. But all on board the Aline, and those on shore who could see the wheel, testify that her helm was starboard. He further says, "I watched the management of the bark all the way round, and she did very well until the Lewis rounded to." Here is the difficulty. The tug brought the bark up too near—at too great speed for safety—and then rounded-to and left her to shift for herself; and then the witness says she was not properly managed because she went into the schooner. It seems, however, from the statement of the same witness, that had the bark continued on the same course she was running when the tug rounded-to, she would have run into the wharf at the speed she was going, and sunk. Now, when we consider—granting the hawser to be forty fathoms, and the tug to have been opposite the Coffin when she commenced rounding-to—that the bark did not have quite twice her length, against wind and tide, in which to head round from the northwest to the southwest, running at a speed of from three to four knots, we can but admire the promptitude with which she obeyed her helm; nor can we fail to discover that it was owing entirely to the skill and good management of the officers of the bark that she did not run directly into the Coffin and sink both vessels. We must conclude, then, that the Aline has been guilty of no fault, and that the tug alone is liable to make good the damage.

I have carefully examined the authorities which govern such cases, and it seems that the principle fairly deducible from them, and from the nature of the contract, is, that a steam tow-boat, unless wholly under the command of the tow, and implicitly obeying its orders, is bound to use all necessary care, foresight and skill to provide for the safety of the tow, or she will be held responsible.